## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) | Case No. 25-11454 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## MOTION OF DEBTORS FOR ENTRY OF
## INTERIM AND FINAL ORDERS (I) AUTHORIZING
## THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER
## COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE THE
## COMPENSATION AND BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state as follows in support of this motion:[2]

### Relief Requested

1.     The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "<u>Interim Order</u>" and the "<u>Final Order</u>," respectively), (a) authorizing, but not directing, the Debtors to (i) pay all prepetition wages, salaries, other compensation, and reimbursable expenses on account of the Compensation and Benefits Programs (as defined below) and (ii) continue to administer the Compensation and Benefits

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343).  The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

[2]    A detailed description of the Debtors and their business, including the facts and circumstances supporting the motion, is set forth in the *Declaration of Chris Cramer, Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of Claire's Holdings LLC and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* filed contemporaneously herewith (the "<u>First Day Declaration</u>"). Capitalized terms used but not defined in this motion shall have the meanings ascribed to them in the First Day Declaration.

Programs in the ordinary course, including payment of prepetition obligations related thereto and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2.　　The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.　　Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.　　The statutory bases for the relief requested herein are sections 105(a), 362(d), 363(b), 363(c), 507(a), 541(b)(1), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1.

## Background

5.　　On August 6, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this motion, the Debtors filed a motion requesting

procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

### The Debtors' Workforce

6.      As of the Petition Date, the Debtors' workforce is comprised of approximately 7,000 employees across the United States (the "Employees") whose skills and knowledge are essential to the Debtors' ordinary course business operations.  Of these, approximately 2,000 are full-time Employees and approximately 5,000 are part-time Employees.  The Employees are compensated on a salaried or hourly basis.

7.      In addition, the Debtors historically sourced, and will continue to source, critical labor support from various agencies and periodically retain specialized individuals as independent contractors through staffing agencies (the "Independent Contractors") to staff their distribution facilities and to perform various administrative services, including data processing and audit services.  The Independent Contractors are an important supplement to the efforts of the Debtors' Employees.  As of the Petition Date, the Debtors retain approximately 185 Independent Contractors.

8.      Together, the Employees and the Independent Contractors perform a variety of critical functions including overseeing sales, accounting, administration, distribution, finance, human resources, management, security, and other tasks that are essential to the Debtors' continued operations and the ultimate preservation of the value of the Debtors' estates.  Importantly, the Debtors depend on the Employees and Independent Contractors for the continued and safe operation of their approximately 1,350 retail store locations and their multiple distribution centers.  Without the Employees and Independent Contractors, the Debtors' store and distribution center operations would cease immediately, resulting in a complete operational shutdown that would be detrimental to the Debtors' cash flow as well as their brand and goodwill.  Indeed, even a temporary disruption

to store or distribution center operations would severely harm the Debtors' ability to maximize the value of their estates. The Employees and Independent Contractors are also intimately familiar with the Debtors' business, processes, and systems and are essential to preserving operational stability and efficiency. Without the continued, uninterrupted services of the Employees and Independent Contractors, the Debtors' business operations would suffer immediate and irreparable harm and their restructuring efforts would be materially impaired.

9. In addition, the vast majority of Employees and Independent Contractors rely on their compensation and benefits to pay their daily living expenses and to support their families. These workers will be exposed to significant financial hardship if the Debtors are not permitted to continue paying wages and salaries, providing employee benefits, and maintaining certain programs benefiting Employees and Independent Contractors in the ordinary course of business. Consequently, the Debtors submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

### Compensation and Benefits Programs

10. To minimize the personal hardship that Employees would suffer and potential Employee attrition that likely would follow if prepetition compensation and benefits obligations remain unpaid during these chapter 11 cases, the Debtors seek authority, but not direction, to (a) pay and honor certain prepetition claims for, among other things: compensation, wages, salaries, commissions, contractor fees, withholding taxes, other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions and other retirement savings contributions), certain non-insider incentive plans, payroll processing, reimbursable expenses, health insurance benefits, medical savings accounts, life and AD&D insurance, short and long-term disability benefits, the workers' compensation program, retirement savings plans, benefit administration services, time-off benefits (including vacation time, unpaid vacation time, excused

work days, holidays, and parental leave), and other benefits that the Debtors historically have provided to Employees and/or Independent Contractors (collectively, the "Compensation and Benefits Programs") and (b) continue to honor obligations relating to the Compensation and Benefits Programs on a postpetition basis, as applicable, in each case, on a case-by-case basis and in the Debtors' discretion, on an interim and a final basis, as detailed herein, and summarized in the chart below.  In addition, the Debtors also seek to pay all costs incidental to the Compensation and Benefits Programs.

11.     Subject to the Court's approval, the Debtors intend to continue their prepetition Compensation and Benefits Programs in the ordinary course and consistent with past practice on a postpetition basis, including paying any outstanding prepetition amounts related thereto. Recognizing that certain of the Compensation and Benefits Programs are mandated by applicable law, out of an abundance of caution, the Debtors further request confirmation of their authority to modify, change, and discontinue any of their Compensation and Benefits Programs and to implement new programs, policies, and benefits, in the ordinary course during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

12.     As set forth below, by this motion, the Debtors seek authority, but not direction, to pay, remit, or reimburse, as applicable, the following aggregate prepetition amounts on account of the Compensation and Benefits Programs:

| Relief Sought | Approximate Interim Amount | Approximate Final Amount[3] |
|---|---:|---:|
| *Compensation and Withholding Obligations* | | |
| Unpaid Wages | $2,000,000 | $2,000,000 |
| Withholdings Obligations | $1,025,000 | $1,025,000 |
| Unpaid Independent Contractor Obligations | $3,800,000 | $3,800,000 |
| Payroll Provider Fees | $40,000 | $40,000 |
| Non-Insider Bonus Programs | $365,000 | $365,000 |
| Non-Insider Severance Program | $0 | $0 |
| Non-Employee Director Compensation | $0 | $0 |
| Reimbursable Expenses | $390,000 | $390,000 |
| *Employee Benefits Programs* | | |
| Health Insurance Programs | $180,000 | $180,000 |
| Life and AD&D Insurance Plans | $2,000 | $2,000 |
| Short-Term Disability Benefits | $10,500 | $10,500 |
| Long-Term Disability Benefits | $1,000 | $1,000 |
| Workers Compensation Program | $1,321,000 | $1,321,000 |
| Employee Assistance Programs | $3,000 | $3,000 |
| Accrued PTO | $ 3,000,000 | $3,000,000 |
| *Other Obligations* | | |
| Business Vehicle Programs | $272,000 | $272,000 |
| Miscellaneous Benefits | $8,000 | $8,000 |
| **Total** | **$12,417,500** | **$12,417,500** |

## I.    Compensation and Withholding Obligations.

### A.    Wages.

13.    The Debtors pay wages, salaries, and other compensation (collectively, excluding reimbursable expenses, commissions, and paid leave, the "Wages") to their Employees on a weekly or biweekly basis depending on such Employee's role.  Because Employees generally are paid in arrears, certain Employees and former Employees will be owed accrued but unpaid Wages as of the Petition Date.  Wages may also be due and owing as of the Petition Date

---

[3]    For the avoidance of doubt, the approximate accrued and unpaid final amounts listed herein are inclusive of the corresponding approximate accrued and unpaid interim amounts.

due to, among other things, pay discrepancies that, upon resolution, may reveal that additional amounts are owed to certain Employees and former Employees.

14.     On average, the Debtors paid approximately $19,400,000 per month on account of Wages for the 12 months immediately preceding the Petition Date.  As of the Petition Date, the Debtors estimate that they owe approximately $2,000,000 in accrued and unpaid Wages (the "Unpaid Wages"), all of which will be come due and payable prior to the final hearing.  The Debtors seek authority, but not direction, to pay any Unpaid Wages, including amounts that may have accrued or been incurred prior to the Petition Date, and continue to pay the Wages on a postpetition basis in the ordinary course and consistent with past practice.  Pursuant to the Interim Order, the Debtors do not seek to pay any outstanding prepetition amounts on account of the Compensation and Benefits Programs in excess of the priority amount of $17,150 imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "Priority Cap"), with the exception of any amounts owing in connection with Accrued PTO (as defined herein), which the Debtors may be required to pay prior to the final hearing in accordance with applicable state law.  The Debtors do not believe that they owe any amounts over the Priority Cap, however, to the extent they do, they request such relief solely pursuant to the Final Order.

### B.     Withholding Obligations.

15.     During each applicable pay period and in the ordinary course of business, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, 401(k) deductions, garnishments, levies, child support and related fees, and pre-tax deductions payable in accordance with certain Compensation and Benefit Programs (collectively, the "Deductions").  On average, the Debtors deducted approximately $1,000,000 per month from Employees' paychecks for the 12 months immediately preceding the Petition Date.

16.    The Debtors also are required by law to withhold from the Employees' Wages amounts related to, among other things, federal, state, and local income taxes, and Social Security and Medicare taxes (collectively, the "Employee Withholding Taxes") for remittance to the appropriate federal, state, and local taxing authorities.  The Debtors must then match the Employee Withholding Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes" and, together with the Employee Withholding Taxes, the "Payroll Taxes").[4]  The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority within a few days of when Employees' payroll checks are disbursed.

17.    On average, the Debtors paid approximately $5,414,000 per month on account of the monthly Payroll Taxes for the 12 months immediately preceding the Petition Date.  As of the Petition Date, the Debtors estimate that approximately $1,025,000 of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") have been deducted but not remitted to the appropriate third-party payees, all of which will become due and payable prior to the final hearing.  As further described herein, the Debtors believe that the Withholding Obligations are not property of their estates because the Debtors are merely holding such obligations in trust on another party's behalf.  However, out of an abundance of caution, the Debtors seek authority to remit the Withholding Obligations to the respective third-party payees and to continue to honor and process the Withholding Obligations on a postpetition basis in the ordinary course of business and consistent with past practice.

---

[4]    For the avoidance of doubt, the Debtors seek authority to pay Payroll Taxes pursuant to this motion and not in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief* filed contemporaneously herewith.

### C.    Independent Contractor Compensation.

18.    The Debtors make payments directly to their Independent Contractors (the "Independent Contractor Compensation") for the performance of certain services critical to the Debtors' operations.  The Debtors rely on the Independent Contractors to complete various projects in furtherance of the Debtors' business and to provide critical support to the Debtors' operations. These Independent Contractors play a crucial role serving the Debtors' customers and driving revenue generation.   The Debtors believe the authority to continue paying the Independent Contractor Compensation is critical to maximizing value and maintaining and administering their estates.

19.    The Debtors paid approximately $1,500,000 per month on account of the Independent Contractor Compensation for the 12 months immediately preceding the Petition Date. As of the Petition Date, the Debtors estimate that they owe approximately $3,800,000 in accrued and unpaid Independent Contractor Compensation, all of which will come due and payable prior to the final hearing.  Accordingly, the Debtors seek authority, but not direction, to pay all outstanding prepetition amounts on account of the Independent Contractor Compensation and to continue to pay the Independent Contractors on a postpetition basis in the ordinary course of business and consistent with past practice.

### D.    Payroll Provider Fees.

20.    In the ordinary course, the Debtors utilize payroll software provided by Workday and ADP (the "Payroll Providers"), which supports payroll processing, payroll tax calculations and filings, and other payroll-related services.  The Debtors pay the Payroll Providers certain software, payroll-related, and other administrative fees (the "Payroll Provider Fees") on an annual basis for Workday and on a monthly basis for ADP.  Failure to satisfy the Payroll Provider Fees in the future could lead to a delay in payroll processing and delayed disbursement of payroll taxes to the

appropriate third parties to the detriment of the Employees and the Debtors' operations.  Continuing

to pay the Payroll Fees, and thus preserving the Debtors' use of the payroll software and their ability

to continue administering payroll, is critical to the Debtors' continued operations while in

chapter 11.

21.    The Debtors paid Workday approximately $1,300,000 in 2024 and paid ADP an

average of approximately $30,000 per month on account of the Payroll Provider Fees for the 12

months immediately preceding the Petition Date.  As of the Petition Date, the Debtors estimate they

owe approximately $40,000 in accrued but unpaid Payroll Provider Fees, all of which is currently

payable or will become payable prior to the final hearing.  Accordingly, the Debtors seek authority,

but not direction, to pay all outstanding prepetition amounts incurred on account of the Payroll

Provider Fees and to continue paying the Payroll Provider Fees on a postpetition basis in the

ordinary course of business and consistent with past practice.

**E.    Non-Insider Bonus Programs.**

22.    In the ordinary course of business, the Debtors maintain two incentive-based bonus

programs (each a "Non-Insider Bonus Program", and collectively, the "Non-Insider Bonus

Programs") for certain Employees who are not "Insiders" of the Debtors.[5]  The Non-Insider Bonus

Programs are comprised of:  (i) a field manager incentive program for District Sales Managers[6] and

Regional Managers[7] (the "Field Manager Incentive Program") and (ii) a field retail associate

---

[5]    "Insiders," as used herein, means the "(i) director of the debtor; officer of the debtor; person in control of the debtor; partnership in which the debtor is a general partner; general partner of the debtor; or relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B).  For the avoidance of doubt, the Debtors reserve all rights with respect to the classification of any Employee as an Insider, and no description of any Compensation and Benefits Programs hereunder indicating that such Compensation and Benefits Programs covers or are made available to Insiders or non-Insiders shall be construed as an admission or concession by the Debtors that any Employee of the Debtors is an Insider.

[6]    "District Sales Managers" refers to Employees who manager certain stores within a specifically assigned district.

[7]    "Regional Managers" refers to Employees who manage all of the stores within a specifically assigned region.

incentive program for field retail associates (the "<u>Field Retail Associate Incentive Program</u>").  Each Non-Insider Bonus Program has a monthly and quarterly component (respectively, the "<u>Monthly Incentive Plan</u>" and the "<u>Quarterly Incentive Plan</u>"), that are tied to specific sales metrics and objectives.

23.     Under the Monthly Incentive Plan, eligible District Sales Managers and Regional Managers (each a "<u>Field Manager</u>" and, collectively, the "<u>Field Managers</u>") can earn up to an additional $120 each month if their assigned stores achieve a certain percentage of the district or regional sales objective.  The Debtors set various targets or sale objectives each month, allowing eligible Field Managers to receive bonuses if their stores achieve a requisite percentage of the overall monthly sales objective.  Similarly, Store Managers, Assistant Store Managers, Managers in Training, and Part Time Managers (each a "<u>Field Retail Associate</u>" and collectively, the "<u>Field Retail Associates</u>") can earn up to an additional $100[8] each month if their assigned store achieves a certain percentage of the store's sales objective.  The Debtors set various store objectives each month, allowing eligible Field Retail Associates to receive bonuses if their store achieves a requisite percentage of the overall monthly store objective.  Payments on behalf of the Monthly Incentive Plan are paid within three weeks following the end of the applicable monthly period.  An Employee must be employed on the program payout date in order to be eligible for the bonus payment.

24.     Under the Quarterly Incentive Plan, eligible Field Managers and Field Retail Associates can earn bonus payments if their assigned store(s) achieve certain sales metrics. Specifically, if the actual sales at the Field Manager's assigned stores exceed the district sales plan by a requisite percentage, then the Field Manager is eligible for a bonus payment up to $2,500 per

---

[8]     Store Managers are eligible to receive a maximum of $100 per month, Assistant Store Managers and Managers in Training are eligible to receive a maximum of $50 per month, and Part Time Managers are eligible to receive a maximum of $30 per month.

fiscal quarter.  Similarly, eligible Field Retail Associates can earn up to $800[9] per fiscal quarter if their assigned store exceeds the store sales plan by a requisite percentage.  Payments on behalf of the Quarterly Incentive Plan are paid within 10 weeks following the end of the applicable fiscal quarter.  An Employee must be employed by the Debtors on the program payout date in order to be eligible for the bonus payment.

25.     The Non-Insider Bonus Programs are integral to maintaining employee morale and loyalty and minimizing attrition and operational disruption during these chapter 11 cases.  Indeed, the Non-Insider Bonus Programs generally align eligible Employees' interests with those of the Debtors by linking payments under the Non-Insider Bonus Programs to the overall performance and efficiency of the Debtors' operations.  Further, the Debtors believe that certain store-level Employees who are eligible for awards under the Non-Insider Bonus Programs view such awards as an integral part of their overall compensation and rely on such awards to pay their living expenses and support their families.

26.     The Debtors paid approximately $4,100,000 in bonuses on account of the Non-Insider Bonus Programs in the 12 months immediately preceding the Petition Date.  As of the Petition Date, the Debtors estimate that they owe approximately $365,000 on account of the Non-Insider Bonus Programs, all of which will become due and payable prior to the final hearing.  The Debtors seek authority, but not direction, to pay any prepetition amounts due under the Non-Insider Bonus Programs and to continue the Non-Insider Bonus Programs on a postpetition basis in the ordinary course of business and consistent with past practice.

---

[9]     Store Managers are eligible to receive a maximum of $800 per quarter, Assistant Store Managers and Managers in Training are eligible to receive a bonus equal to 25% of the Store Manager's quarterly bonus, and Part Time Managers are eligible to receive a bonus equivalent to 10% of the Store Manager's quarterly bonus.

**F.      Non-Insider Severance Program.**

27.      In the ordinary course of business, Debtors previously maintained a discretionary severance program for the benefit of certain non-insider Employees (the "Non-Insider Severance Program").  Under the Non-Insider Severance Program, certain Employees may be eligible for payment of severance if their employment is terminated due to a workforce adjustment or any not-for-cause employer-initiated termination.  Such severance payments (the "Non-Insider Severance Obligations") are calculated based on the Employee's compensation level, as well as any cash benefits to which he or she was entitled under his or her employment agreements, subject to applicable taxes.  To the extent the Debtors owe any Non-Insider Severance Obligations, such payments are paid in a lump sum at the time of termination.

28.      Prior to the Petition Date and in light of liquidity constraints, the Debtors, in their business judgment, elected to exercise their discretion under the Non-Insider Severance Program and cease paying any Non-Insider Severance Obligations unless required under applicable state law.  Accordingly, the Debtors do not believe any former Employees are entitled to payment on account of Non-Insider Severance Obligations.  The Debtors seek authority to honor Non-Insider Severance Obligations on a postpetition basis solely as required by law.  For the avoidance of doubt, the Debtors are not seeking relief to pay any of the Debtors' Insiders under the Non-Insider Severance Programs.

**G.      Non-Employee Director Compensation.**

29.      As of the Petition Date, the Debtors' boards of directors includes eight non-Employee individuals who serve as directors (the "Non-Employee Directors").  The Debtors pay the Non-Employee Directors monthly or quarterly (in arrears) cash payments, as applicable (the "Director Fees").  On average, the Debtors pay approximately $126,000 per month on Director Fees.  The Non-Employee Directors are also generally entitled to advance payment for reasonable

out-of-pocket expenses incurred in connection with their board service (together with the Director Fees, the "Non- Employee Director Compensation").  The Non-Employee Directors are critical components of the Debtors' governance structure and vital to ensuring that the Debtors continue to adhere to governance best practices.

30.     As of the Petition Date, the Debtors do not believe they owe any amounts on account of Non-Employee Director Compensation and believe that they are authorized to pay any postpetition Director Compensation in the ordinary course.  Out of an abundance of caution, however, the Debtors seek authority, but not direction, to continue to pay the Non-Employee Director Compensation on a postpetition basis in the ordinary course of business and consistent with past practice.

### H.     Reimbursable Expenses and Corporate Cards.

31.     The Debtors reimburse certain Employees or pay credit card invoices on their behalf for approved expenses incurred on behalf of the Debtors in the ordinary course.  The Debtors expect that the Employees will continue to incur necessary reimbursable expenses (the "Reimbursable Expenses") in connection with the Debtors' business operations.  Reimbursable Expenses typically include out-of-pocket expenses associated with transportation, lodging, and meals incurred in connection with business travel and certain other work-related expenses. Generally, Reimbursable Expenses are incurred directly by the Employees with personal funds. Accordingly, without reimbursement, Employees may be held personally liable for any unpaid obligations.  The Debtors' inability to reimburse such expenses would impose significant financial hardship on such individuals where the obligations were incurred for the Debtors' benefit.

32.     In connection with the Debtors' reimbursement program, certain Employees are provided with corporate credit cards (the "Corporate Credit Cards"), serviced by U.S. Bank, that can be used to make work-related purchases.  The Debtors have issued Corporate Credit Cards to

approximately 75 Employees, each in the Employee's own name. Employees are personally responsible for making payments on their Corporate Credit Cards and may submit expense reports to seek reimbursement from the Debtors for these payments, as well as for work-related purchases charged to the Employees' personal credit cards (together with the Corporate Credit Cards, the "Employee Credit Cards").

33.     On average, the Debtors pay approximately $140,000 each month on account of Reimbursable Expenses charged to Employee Credit Cards (the "Employee Credit Card Reimbursements"). As of the Petition Date, the Debtors estimate that they owe approximately $121,000 on account of Employee Credit Card Reimbursements.

34.     As of the Petition Date, the Debtors estimate that they will owe approximately $390,000 in the aggregate amount of accrued but unpaid Reimbursable Expenses, all of which will become due and payable prior to the final hearing. Accordingly, the Debtors seek authority, but not direction, to satisfy any accrued but unpaid prepetition Reimbursable Expenses and continue to pay the Reimbursable Expenses, on a postpetition basis in the ordinary course of business and consistent with past practice.

**II.     Employee Benefits Programs.**

35.     The Debtors offer certain health and welfare benefits programs to eligible Employees and former Employees, including Health Insurance Programs, Life and AD&D Insurance Programs, Disability Benefits, the Workers Compensation Program, Employee Assistance Programs, Paid and Unpaid Leave, and the 401(k) Plan (each as defined herein, and, collectively, the "Employee Benefits Programs").

36.     As of the Petitions Date, the Debtors estimate that they owe approximately $4,517,500 on account of the Employee Benefit Programs, all of which will become due and payable prior to the final hearing. Accordingly, the Debtors seek authority, but not direction, to

pay any prepetition amounts owed on account of the Employee Benefits Programs and to continue the Employee Benefits Programs on a postpetition basis in the ordinary course of business and consistent with past practice.  Each of the Employee Benefit Programs is described in greater detail below.

### A.    Health Insurance Programs.

37.    In the ordinary course of business, the Debtors offer eligible Employees the opportunity to participate in or are otherwise provided a number of health benefit plans, including medical plans, vision plans, and dental plans (collectively, the "Health Insurance Programs").  The Debtors subsidize or continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").  The Debtors also offer eligible Employees the opportunity to contribute a portion of their pre-tax compensation to pay for certain health care expenses or dependent care expenses through a health savings account program (the "HSA Program") administered by Fidelity Investments ("Fidelity").  As of the Petition Date, the Debtors estimate that they owe approximately $10,000 on account of the HSA Program, all of which will become due and payable prior to the final hearing.

38.    On average, the Debtors paid approximately $1,350,000 per month on account of the Health Insurance Programs for 12 months immediately preceding the Petition Date.  As of the Petition Date, the Debtors estimate that they owe approximately $180,000 on account of the Health Insurance Programs, all of which will become due and payable prior to the final hearing.  Accordingly, the Debtors seek authority, but not direction, to pay any outstanding prepetition amounts on account of the Health Insurance Programs and to continue the Health Insurance Programs and pay any amounts related thereto on a postpetition basis in the ordinary course of business and consistent with past practice.

16

**B.      Life and AD&D Insurance, Disability Benefits, Workers' Compensation, and Assistance Programs.**

**i.      Life and AD&D Insurance Programs.**

39.      The Debtors provide basic life insurance and accidental death and dismemberment insurance coverage (the "Basic Life & AD&D Insurance") to Employees through New York Life Insurance Company ("New York Life"), which provides maximum coverage of $50,000 to corporate Employees and $15,000 to all other Employees in the event of an Employee's death or dismemberment.      In addition, Employees can also purchase voluntary life insurance (the "Voluntary Life Insurance," and together with the Basic Life & AD&D Insurance, the "Life & AD&D Insurance Plans") covering themselves and their spouses and children at discounted group rates provided by New York Life.

40.      The yearly cost to the Debtors for the Life and AD&D Insurance Plans is approximately $210,000.  As of the Petition Date, the Debtors estimate that they currently owe approximately $2,000 on account of the Life and AD&D Insurance Plans, all of which will come due and payable prior to the final hearing.

**ii.      Short Term Disability Benefits.**

41.      The Debtors provide all eligible, full-time hourly and salaried Employees with short-term disability benefits (the "Short-Term Disability Benefits").  All such Employees are automatically enrolled in the Short-Term Disability Benefits program administered by New York Life.  Under the short-term Disability Benefits Plan, eligible Employees are entitled to, among other things, continuation of at least 50% (and up to 100%) of their base wages up to a weekly limit depending on their role at the Company in the event of a short-term medical disability due to an

illness, injury, or pregnancy related condition.[10]   As of the Petition Date, approximately 120 Employees receive Short-Term Disability Benefits.

42.     In the aggregate, the Debtors pay approximately $60,000 per month on account of administrative fees and premiums with respect to the Short-Term Disability Benefits.   As of the Petition Date, the Debtors estimate that they owe $10,500 on account of the Short-Term Disability Benefits, all of which will come due and payable prior to the final hearing.

### iii.      Long-Term Disability Benefits.

43.     Certain of the Debtors' Employees are eligible to participate in a voluntary long-term disability benefits program administered by New York Life (the "Long-Term Disability Benefits" and, together with the Short-Term Disability Benefits, the "Disability Benefits").   Under the Long-Term Disability Benefits program, participating Employees are entitled to 60% of their gross disability payment up to a monthly limit of $10,000.   The total cost of the Long-Term Disability Benefits program is approximately $6,000 per month, which is fully covered by premiums paid by participating Employees.   The Debtors estimate that they currently owe approximately $1,000 on account of the Long-Term Disability Benefits, all of which will come due and payable prior to the final hearing.

### iv.      Workers' Compensation Program.

44.     All of the Debtors' Employees are covered by workers' compensation insurance, effective the first day of employment.   Workers' compensation insurance provides employees or their beneficiaries with certain benefits in the event of job-related illness, injury, or accidental death, (collectively, the "Workers' Compensation Program").   The Debtors pay the full cost of the

---

[10]    Employees located in California, Hawaii, New Jersey, New York, Puerto Rico, or Rhode Island are not eligible for these standard Short-Term Benefits.

worker's compensation insurance.  The Debtors maintain coverage for the Workers' Compensation Program through XL Specialty Insurance Company (the "Insurance Provider") or applicable state provided programs.  The Debtors pay approximately $250,000 annually to maintain the Workers' Compensation Program.  As of the Petition Date, the Debtors estimate that they owe approximately $21,000 to Insurance Providers on account of the Workers' Compensation Program, all of which will come due and payable prior to the final hearing.

45.    The Debtors must continue the claim assessment, determination, adjudication, and payment processing pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[11]  As of the Petition Date, there are 60 open claims under the Workers' Compensation Program, with a total estimated loss liability of $1,300,000 that insurers may pay out on these claims.

46.    For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their contractual and legal obligations, the Debtors must continue to assess, determine, and adjudicate claims brought under the Workers' Compensation Program during these chapter 11 cases.  In addition, to the extent any Employees assert claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program.  This requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

---

[11]    The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  The Debtors request authority to continue making all payments related to Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

47. Because the Debtors may be statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that would disrupt the chapter 11 process. Accordingly, the Debtors seek authority to continue the Workers' Compensation Program on a postpetition basis in the ordinary course of business and consistent with past practice, including making payment on any prepetition obligations owed thereunder and continuing to pay any such obligations as they come due in the ordinary course of business postpetition and consistent with prepetition practice. Moreover, the Workers' Compensation Programs may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. The Debtors request authority to continue making all payments related to Workers' Compensation Programs postpetition, including making changes to current policy and practices that become necessary.

48. In addition, to the extent any Employee asserts claims under the Workers' Compensation Program over the course of these chapter 11 cases, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit such Employee to proceed with such claims. For the avoidance of doubt, this requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

**v.      Employee Assistance Programs.**

49. The Debtors provide Employees and their immediate family members with free, confidential, and voluntary counseling and referral services provided by ComPsych (the "Employee Assistance Programs"). The Employee Assistance Programs provide Employees with emotional and mental well-being resources to help address and solve personal or work-related issues such as work-life stressors, family issues, financial concerns, relationship problems, substance abuse, or legal concerns that become a problem in an Employee's life. The Debtors estimate that they

currently owe approximately $3,000 on account of the Employee Assistance Programs, all of which will come due and payable prior to the final hearing.

### C.    Paid and Unpaid Leave.

50.    The Debtors provide paid leave in the form of PTO (as defined below) and certain other statutory paid leave (together, the "Paid Leave").  In the ordinary course, the Debtors provide paid time off ("PTO") to Employees as a Paid Leave benefit that may be used for vacations, parent/teacher conferences, or other personal business.  Both salaried and hourly Employees accrue PTO based on the Employee's level, area of employment, and tenure.  By this motion, the Debtors seek only to pay accrued, unused PTO ("Accrued PTO") as mandated by state law.  The Debtors estimate that, as of the Petition Date, the aggregate amount of Accrued PTO is approximately $3,000,000, all of which may become due and payable prior to the final hearing.  This amount, however, is not a current cash payment obligation as such obligation only becomes payable upon an applicable Employee's termination.

51.    In addition, the Debtors provide certain other forms of Paid Leave to certain Employees, including:

- paid holidays throughout the year, during which eligible Employees are not required to work and are paid their base rate of pay;

- Paid Leave under the Family and Medical Leave Act; and

- other Paid Leave for personal reasons, many of which are required by law, including statutory sick leave, workers' compensation leave, missed work time in the ordinary course for bereavement leave, jury or court attendance, and time spent voting.

These other forms of Paid Leave do not involve incremental cash outlays beyond standard payroll obligations.

52.    Other than with respect to Accrued PTO required to be paid out in certain circumstances as discussed above, Paid Leave typically does not involve incremental cash outlays

beyond standard payroll obligations.  Out of an abundance of caution, however, the Debtors seek authority to continue the Paid Leave policies, as required by law, in the ordinary course of business on a postpetition basis and pay prepetition claims, if any, with respect thereto, including making any cash-out payments of Accrued PTO with respect to Employees terminated after the Petition Date as may be required by state law.

**D.    The 401(k) Plan.**

53.    The Debtors maintain a retirement savings plan for the benefit of their Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan is administered by Fidelity and allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.  Each pay period, the Debtors deduct their Employees' 401(k) Plan contributions from the applicable Employees' paychecks (the "401(k) Deductions") and hold such amounts in trust until they are forwarded to Fidelity.  Any outstanding balance as of the Petition Date is included as part of Withholdings Obligations above.  Many Employees' retirement savings consist primarily of the 401(k) Plan. Thus, the Debtors believe that continuing the 401(k) Plan is essential to maintaining Employee morale and protecting Employees.  In addition, the Debtors believe that the 401(k) Deductions are generally held in trust by the Debtors and are not property of their estates.  Accordingly, the Debtors seek authority, but not direction, to:  (a) continue the 401(k) Plan in the ordinary course of business and consistent with past practice during the administration of these chapter 11 cases; and (b) honor all unremitted 401(k) Obligations in the ordinary course of business and consistent with past practice during the administration of these chapter 11 cases and to pay any prepetition claims related thereto.

### III.    Other Obligations

####     A.    Business Vehicle Programs.

#####         i.    Automotive Allowance Program.

54.     The Debtors provide certain Employees with allowances (each, an "Automotive Allowance") to cover the costs associated with owning or leasing a vehicle (the "Automotive Allowance Program").  As of the Petition Date, 10 Employees participate in the Automotive Allowance Program.  Automotive Allowances are disbursed to Employees in fixed amounts and are paid through the Debtors' payroll system.  The Debtors estimate that the average annual cost of the Automotive Allowance Program is approximately $121,000.  As of the Petition Date, the Debtors owe approximately $2,000 on account of the Automotive Allowance Program, all of which will come due and payable prior to the final hearing.

#####         ii.    Leased Company Car Program.

55.     The Debtors also provide certain Employees who frequently are required to travel to multiple store locations in the course of their daily work with a vehicle (each, a "Company Car") to use for both business and personal purposes (the "Leased Company Car Program").  As of the Petition Date, approximately 67 Employees participate in the Leased Company Car Program.  The Debtors enter into agreements with car companies to lease the Company Cars (the "Company Car Leases").  Pursuant to the Company Car Leases, the Debtors are obligated to make monthly payments in consideration for the eligible Employees' use of the Company Cars.  Although eligible Employees may use the Company Cars for personal purposes, Employees are required to record the mileage associated with their personal use of the Company Car.  The economic value of the Employee's personal use of the Company Car is then included on the Employee's paycheck as a taxable fringe benefit.  The Debtors estimate that the average annual cost of the Company Car Leases is approximately $1,200,000.  As of the Petition Date, the Debtors estimate that they owe

approximately $170,000 on account of the Company Car Leases, all of which will become due and payable prior to the final hearing.

56.    As part of the Leased Company Car Program, the Debtors provide employees with credit cards to purchase fuel (the "Fuel Cards").  The Fuel Cards are billed directly to the Debtors. In the last 12 months immediately preceding the Petition Date, the Debtors spent approximately $55,000 per month on account of the Fuel Cards.  Additionally, the Debtors cover the maintenance costs of the Company Cars (the "Company Car Maintenance Costs" and, together with the costs associated with the Fuel Cards, the "Company Car Fuel and Maintenance Costs").  In the 12 months immediately preceding the Petition Date, the Debtors spent approximately $30,000 per month on account of the Company Car Maintenance Costs.  As of the Petition Date, the Debtors estimate that they owe approximately $100,000 on account of the Company Car Fuel and Maintenance Costs, all of which will come due and payable prior to the final hearing.

57.    The Debtors estimate that the average annual cost of the Leased Company Car Program is approximately $2,220,000.  As of the Petition Date, the Debtors estimate that they owe approximately $270,000 on account of the Leased Company Car Program, all of which will come due and payable prior to the final hearing.

**B.    Miscellaneous Benefits.**

58.    In addition to the above-mentioned benefits programs, the Debtors historically maintain various other benefits programs, including the MetLife home and auto policies, legal assistance program, and critical illness insurance (the "Miscellaneous Benefits").  The Miscellaneous Benefits are an important part of the total benefits package offered by the Debtors to their Employees.

59.    On average, the Debtors paid approximately $70,000 per month on account of the Miscellaneous Benefits for the 12 months immediately preceding the Petition Date.  Additionally,

the Debtors estimate that they currently owe approximately $8,000 on account of the Miscellaneous Benefits, all of which will come due and payable prior to the final hearing.  The Debtors seek authority, but not direction, to pay unpaid prepetition amounts owed on account of the Miscellaneous Benefits and to continue paying amounts that come due on a postpetition basis in the ordinary course and consistent with past practice.

60.    The Miscellaneous Benefits are an important part of the total benefits package offered by the Debtors to their Employees.  The Debtors therefore seek authority, but not direction, to pay unpaid prepetition amounts owed on account of the Miscellaneous Benefits and to continue paying amounts that come due on a postpetition basis in the ordinary course of business, and consistent with past practice.

## Basis for Relief

I.    **Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Programs.**

A.    **Certain Compensation and Benefits Programs Are Entitled to Priority Treatment.**

61.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Compensation and Benefits Programs to priority treatment, to the extent such payments do not exceed $17,150 for each individual as provided for under sections 507(a)(4) and (5) of the Bankruptcy Code.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code for (a) wages, salaries, or commissions, including vacation, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan).  To the extent that an Employee receives no more than $17,150 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact

on recoveries for general unsecured creditors.  For the avoidance of doubt, to the extent the Debtors

seek to pay outstanding prepetition amounts on account of the Compensation and Benefits Programs

in excess of the Priority Cap, the Debtors request such relief solely pursuant to the Final Order,

*provided*, *however*, the Debtors seek authority to pay amounts in excess of the Priority Cap pursuant

to the Interim Order only with respect to any Accrued PTO that is required to be paid prior to the

final hearing pursuant to applicable state law.  Given the importance of these Employees to the

Debtors' operations, however, such payment is warranted under section 363(b)(1) of the

Bankruptcy Code and the doctrine of necessity, as explained further below.

62.     The Debtors' Employees are essential to the success of these chapter 11 cases and

the Debtors' business.  As such, payment of obligations on account of the Compensation and

Benefits Programs at this time is necessary to avoid potential material disruption to the Debtors'

ordinary-course operations.   Finding, attracting, and training new qualified talent would be

extremely difficult in light of the circumstances.  Even if ultimately successful, such recruitment

efforts would most likely leave the Debtors with personnel vacancies at a critical business juncture

and, once replacement personnel were hired, leave the Debtors to invest additional resources in

training new staff members.  The additional uncertainty created by needing to expend time,

manpower, and money recruiting and training new personnel at a critical time would be non-

accretive.  In light of Debtors' ongoing monetization efforts, losing the Debtors' significant talent

base would create additional challenges to maximizing value in these chapter 11 cases.

Furthermore, to avoid potentially costly disputes that could reduce the value of the Debtors' estates,

as well as ease potential concerns from non-terminated Employees regarding ongoing

compensation, it is prudent for the Debtors to be authorized, but not directed, to pay any accrued

but unpaid amounts, as may be required by law, on account of the Compensation and Benefits Programs owed to recently terminated Employees.

**B.     Payment of Certain Compensation and Benefits Programs Is Required by Law.**

63.     As discussed above, the Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks.  Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d).  Furthermore, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority.  26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its Employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors should be authorized to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business, and consistent with past practice.  *See In re Dameron*, 155 F.3d 718, 721 (4th Cir. 1998) (stating "[W]hen a debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate' for purposes of the Bankruptcy Code.").

64.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, state laws may

prohibit the Debtors from operating in those states.   Payment of all Workers' Compensation Program amounts is therefore crucial to the monetization of the Debtors' assets and subsequent orderly wind-down.  The Debtors therefore request that the Court authorize the Debtors to maintain the Workers' Compensation Program.

65.    The Debtors therefore request that the Court recognize that the Withholding Obligations are not property of the Debtors' estates and, regardless of whether the Debtors collected the amounts prior to the Petition Date, authorize the Debtors to transmit such monies to the proper parties in the ordinary course of business and consistent with past practice.

## II.    Payment of the Compensation and Benefits Programs Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

66.    Section 363(c)(1) of the Bankruptcy Code expressly grants the Debtors the authority to "enter into transactions . . . in the ordinary course of business" and "use property of the estate in the ordinary course of business without notice or a hearing."   Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to the Compensation and Benefits as such actions are in the ordinary course of the Debtors' business.  Out of an abundance of caution, however, the Debtors seek entry of an order granting the relief requested herein to avoid any destruction to the value of their estates.

67.    Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *In re James A. Phillips, Inc.*, 29 B.R. 391, 398 (S.D.N.Y. 1983).   Several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims.

68.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also James A. Phillips, Inc.*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b)). In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor in possession to 'protect and preserve the estate, including an operating business' going-concern value." *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *CoServ*, 273 B.R. at 497).

69.     Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. *See Just for Feet*, 242 B.R. at 825–26. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of

necessity"). *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)). Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.

70. Payment of amounts owed on account of the Compensation and Benefits Programs is warranted under this authority and the facts of these chapter 11 cases. The Employees and Independent Contractors are essential to the success of these chapter 11 cases. As the Debtors seek to monetize their assets and effectuate a value-maximizing transaction, it is imperative that the Debtors' workforce remains fully engaged, motivated, and productive. Absent timely payment of amounts owed pursuant to the Compensation and Benefits Programs to Employees and Independent Contractors, the Debtors risk workforce attrition and resulting business disruption, which stands to materially impair estate value. Accordingly, the relief requested herein is a necessary and critical element of the Debtors' efforts to maximize estate value.

71. Continuing ordinary course benefits will help reduce the adverse effect of the commencement of these chapter 11 cases on the Debtors' business operations. In addition, many Employees and Independent Contractors rely exclusively on the Compensation and Benefits

Programs to satisfy their daily living expenses and consequently will be exposed to significant financial difficulties if the Debtors are not permitted to honor unpaid obligations on account of the Compensation and Benefits Programs in the ordinary course.  Accordingly, the relief requested herein is a necessary and critical element of the Debtors' efforts to maximize estate value and will give the Debtors the greatest likelihood of retention of their Employees and Independent Contractors as the Debtors seek to operate their business in these chapter 11 cases.

72.     The importance of a debtor's workforce to its operation has been repeatedly recognized by courts in this district, and such courts in this district have granted similar relief to that requested herein.  *See, e.g.*, *In re Marelli Auto. Lighting USA*, No. 25-11034 (CTG) (Bankr. D. Del. July 23, 2025) (authorizing the debtors to pay prepetition wages, salaries, other compensation, and reimbursable expenses, and continue employee benefits programs); *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 14, 2025) (same); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Mar. 19, 2025) (same); *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Jan. 16, 2025) (same); *In re Am. Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Nov. 18, 2024) (same).[12]

## III.   A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

73.     Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title…"  11 U.S.C. § 362(a)(1).

---

[12]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

74.     Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1).  Cause exists here to modify the automatic stay to permit the Employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum. Staying the workers' compensation claims could frustrate Employees' reasonable expectations and lead to the departure of Employees who are important to the Debtors' business operations as they pursue a value-maximizing sale and orderly wind-down.  Such departures could cause a severe disruption in the Debtors' business, which would be to the detriment of all parties in interest.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

75.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored.  Therefore, the Debtors request authority to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

76.     Bankruptcy Rule 6003 empowers a court to grant certain relief within the first 21 days after the petition date only to the extent that relief is "needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a).  For the reasons set forth above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive the requested relief during the first 21 days of these chapter 11 cases

would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm.  The requested relief is necessary for the Debtors to operate their business in a value-maximizing manner for the benefit of all stakeholders.  The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and request that the Court grant the requested relief.

## **Reservation of Rights**

77.     Notwithstanding anything to the contrary herein, nothing contained in this motion or any actions taken pursuant to any order granting the relief requested in this motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount, validity, or priority of, or basis for, any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to

the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

78.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

79.     The Debtors will provide notice of this motion to the following parties or their respective counsel, as applicable:  (a) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) the Priority Term Loan Agent; (c) the Existing Term Loan Agent; (d) the Agent under the ABL Facility; (e) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (f) the United States Attorney for the District of Delaware; (g) the Internal Revenue Service; (h) the state attorneys general for states in which the Debtors conduct business; and (i) any party that is entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013 1(m).  In light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

80.    No prior request for the relief sought in this motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  August 6, 2025
Wilmington, Delaware

/s/ Zachary I. Shapiro
**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Clint M. Carlisle (No. 7313)
Colin A. Meehan (No. 7237)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:      (302) 651-7701
Email:           defranceschi@rlf.com
                    heath@rlf.com
                    shapiro@rlf.com
                    carlisle@rlf.com
                    meehan@rlf.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Allyson B. Smith (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           joshua.sussberg@kirkland.com
                    allyson.smith@kirkland.com

- and -

Alexandra F. Schwarzman, P.C. (*pro hac vice* pending)
Robert A. Jacobson (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           alexandra.schwarzman@kirkland.com
                    rob.jacobson@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) Case No. 25-11454 (___) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |
|  | ) **Re: Docket No. __** |

### INTERIM ORDER (I) AUTHORIZING THE
### DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER
### COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE THE
### COMPENSATION AND BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"), (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses on account of the Compensation and Benefits Programs and (ii) continue to administer the Compensation and Benefits Programs in the ordinary course, and consistent with past practice, including payment of certain undisputed prepetition obligations related thereto, (b) scheduling a final hearing to consider approval of the Motion on a final basis, and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343). The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein, if any, at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth herein.

2.      Any objections to the entry of this Interim Order, to the extent not withdrawn or settled, are overruled.

3.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2025, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2025 and shall be served on: (a) the Debtors, Claire's Holdings LLC, 2400 West Central Road, Hoffman Estates, Illinois 60192, Attn.: Brendan McKeough, Executive Vice President, Chief Legal Officer, and Secretary (brendan.mckeough@claires.com) and 3 SW 129th Avenue, Pembroke Pines, Florida 33027, Attn: Michele Reilly, Assistant Secretary (michele.reilly@claires.com); (b) proposed co-counsel to the Debtors, (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York

10022, Attn.: Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com) and Allyson B. Smith
(allyson.smith@kirkland.com) and 333 West Wolf Point Plaza, Chicago, Illinois 60654,
Attn.: Alexandra F. Schwarzman, P.C. (alexandra.schwarzman@kirkland.com) and Robert A.
Jacobson (rob.jacobson@kirkland.com) and (ii) Richards, Layton & Finger, PA, 920 N King Street,
Wilmington, Delaware 19801, Attn:  Paul N. Heath (heath@rlf.com) and Zachary I. Shapiro
(shapiro@rlf.com); (c) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington,
Delaware 19801, Attn.: Benjamin A. Hackman (Benjamin.A.Hackman@usdoj.gov); (d) counsel to
the Prepetition Priority Term Loan Agent and Existing Prepetition Term Loan Agent, Ankura Trust
Company, LLC, Cahill Gordon & Reindell LLP, Attn.: Joel Moss (JMoss@cahill.com), Amit
Trehan (ATrehan@cahill.com), and Sean Tierney (STierney@cahill.com); (e) counsel to the
Prepetition ABL Agent, JPMorgan Chase Bank, N.A., Simpson Thacher & Bartlett LLP,
Attn.: Elisha D. Graff (egraff@stblaw.com) and Zachary J. Weiner (zachary.weiner@stblaw.com)
and Potter Anderson & Corroon LLP, Attn: L. Katherine Good (kgood@potteranderson.com) and
Jeremy Ryan (jryan@potteranderson.com); and (f) any statutory committee appointed in these
chapter 11 cases.

4.      The Debtors are authorized, but not directed, to continue, amend, modify, change,
and/or discontinue the Compensation and Benefits Programs and to implement new programs,
policies, and benefits, in the ordinary course of business and consistent with past practice, during
these chapter 11 cases and without the need for further Court approval, subject to applicable law.

5.      The Debtors are authorized, but not directed, to pay and honor any prepetition
amounts related to the Compensation and Benefits Programs pursuant to this Interim Order in the
ordinary course of business and consistent with past practice in an aggregate amount not to exceed
$12,417,500; *provided* that pending entry of the Final Order, the Debtors shall not honor any

obligations on account of the Compensation and Benefits Programs that exceed the priority amounts set forth in sections 507(a)(4) or 507(a)(5) of the Bankruptcy Code; with the exception of any Accrued PTO obligations that are required to be paid out prior to the final hearing pursuant to state law.

6.     Nothing herein shall be deemed to authorize the payment of any amounts that violate or implicate section 503(c) of the Bankruptcy Code; *provided* that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code by separate motion at a later time.

7.     Pursuant to section 362(d) of the Bankruptcy Code:  (a) the automatic stay is modified so that Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program, and the Debtors are authorized, but not directed, to pay all undisputed prepetition amounts relating thereto in the ordinary course and consistent with past practice; and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived.  This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program, and any such claims must be pursued in accordance with the applicable Workers' Compensation Program. Payment on account of any recoveries obtained in connection with a claim brought pursuant to this paragraph is limited to the terms and conditions of the applicable Workers' Compensation Program, including with regard to any policy limits or caps.

8.     The Debtors are authorized, but not directed, to forward any unpaid amounts on account of Payroll Provider Fees or Withholding Obligations to the appropriate third-party recipients or taxing authorities in the ordinary course of business and consistent with past practice.

9.      The Debtors are authorized, but not directed, to pay in the ordinary course of business and consistent with past practice any costs and expenses incidental to payment of the Compensation and Benefits Programs obligations, including all administrative and processing costs, and necessary payments to outside professionals.

10.      The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

11.      Nothing contained in the Motion or this Interim Order, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with this Interim Order), is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount, validity, or priority of, or basis for, any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in the Motion or this Interim Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or

rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  Any payment made pursuant to this Interim Order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

12.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

13.     Notwithstanding anything to the contrary in this Interim Order, any payment to be made, obligation incurred or authorization contained herein shall be subject to and in compliance with the "Approved Budget" as defined in the orders of the Court approving the consensual use of cash collateral in these chapter 11 cases (including with respect to timing of payments thereunder) (the "Cash Collateral Orders"); *provided* that notwithstanding the forgoing or anything to the contrary in the Cash Collateral Orders, including any budget or cash flow forecasts attached to or incorporated in the Cash Collateral Orders, the Debtors shall be permitted to pay any Accrued PTO or Severance obligations on account of eligible Employees solely to the extent applicable state law requires payments upon termination of an employee.

14.     Nothing in this Interim Order authorizes the Debtors to accelerate any payments not otherwise due prior to the date of the Final Hearing.

15.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003.

16.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

17.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

18.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

19.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

**<u>Exhibit B</u>**

**Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) Case No. 25-11454 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) **Re: Docket No. __** |

**FINAL ORDER (I) AUTHORIZING THE
DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER
COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE THE
COMPENSATION AND BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"), (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses on account of the Compensation and Benefits Programs and (ii) continue to administer the Compensation and Benefits Programs in the ordinary course, and consistent with past practice, including payment of certain undisputed prepetition obligations related thereto, (b) scheduling a final hearing to consider approval of the Motion on a final basis, and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343). The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein, if any, at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis as set forth herein.

2.      Any objections to the entry of this Final Order, to the extent not withdrawn or settled, are overruled.

3.      The Debtors are authorized, but not directed, to continue, amend, modify, change, and/or discontinue the Compensation and Benefits Programs and to implement new programs, policies, and benefits, in the ordinary course of business and consistent with past practice, during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

4.      Notwithstanding anything to the contrary herein, the Debtors are authorized to pay and honor prepetition amounts related to the Compensation and Benefits Programs pursuant to this Final Order in the ordinary course of business and consistent with past practice, including, for the

avoidance of doubt, any prepetition obligations relating to the Compensation and Benefits Programs, if any, that exceed the priority amounts set forth in section 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

5.      Nothing herein shall be deemed to authorize the payment of any amounts that violate or implicate section 503(c) of the Bankruptcy Code; *provided* that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code by separate motion at a later time.

6.      Pursuant to section 362(d) of the Bankruptcy Code:  (a) the automatic stay is modified so that Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program, and the Debtors are authorized, but not directed, to pay all undisputed prepetition amounts relating thereto in the ordinary course and consistent with past practice; and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived.  This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program and any such claims must be pursued in accordance with the applicable Workers' Compensation Program. Payment on account of any recoveries obtained in connection with a claim brought pursuant to this paragraph is limited to the terms and conditions of the applicable Workers' Compensation Program, including with regard to any policy limits or caps.

7.      The Debtors are authorized, but not directed, to forward any unpaid amounts on account of Payroll Provider Fees or Withholding Obligations to the appropriate third-party recipients or taxing authorities in the ordinary course of business and consistent with past practice.

8.      The Debtors are authorized, but not directed, to pay in the ordinary course of business and consistent with past practice any costs and expenses incidental to payment of the

Compensation and Benefits Programs obligations, including all administrative and processing costs, and necessary payments to outside professionals.

9.      Nothing contained herein is intended or should be construed to create an administrative priority claim on account of the Compensation and Benefits Programs obligations.

10.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

11.     Nothing contained in the Motion or this Final Order, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with this Final Order), is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount, validity, or priority of, or basis for, any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in the Motion or this Final Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any

agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  Any payment made pursuant to this Final Order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

12.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

13.     Notwithstanding anything to the contrary in this Final Order, any payment to be made, obligation incurred or authorization contained herein shall be subject to and in compliance with the "Approved Budget" as defined in the Cash Collateral Orders; *provided* that notwithstanding the forgoing or anything to the contrary in the Cash Collateral Orders, including any budget or cash flow forecasts attached to or incorporated in the Cash Collateral Orders, the Debtors shall be permitted to pay any Accrued PTO or Severance obligations on account of eligible Employees solely to the extent applicable state law requires payments upon termination of an employee.

14.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

15.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

16.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

17.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.