**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) | Case No. 25-11454 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF AMY LEE IN
SUPPORT OF THE MOTION OF DEBTORS
FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND
(B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

I, Amy Lee, make this declaration pursuant to 28 U.S.C. § 1746:

1. I am a Managing Director at Alvarez & Marsal North America LLP ("A&M"), a restructuring advisory services firm with numerous offices throughout the country. A&M is the proposed restructuring advisor to the above-captioned debtors and debtors in possession (the "Debtors").

2. I submit this declaration (this "Declaration") in support of the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens And Superpriority Administrative*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343). The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

*Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion"),[2] filed contemporaneously herewith.

3.     The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of A&M working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional. Specifically, I have been part of the A&M team, which, since May 2, 2025, has been one of the principal restructuring advisors to the Debtors. In that capacity, I work closely with the Debtors' management and other professionals with respect to the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projections, budgets, and other financial information, and I have been directly involved in the matters leading up to the Debtors' chapter 11 filings and liquidity management measures. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

## Background and Qualifications

4.     A&M is a preeminent restructuring consulting firm with extensive experience and an excellent reputation for providing high-quality, specialized management and restructuring advisory services to debtors and distressed companies. A&M provides a wide range of turnaround advisory services targeted at stabilizing and improving a company's financial position, including:

---

[2] A detailed description of the Debtors and their business, including the facts and circumstances supporting the DIP Motion, is set forth in the *Declaration of Chris Cramer, Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of Claire's Holdings LLC and Certain of Its Affiliates in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 27] (the "First Day Declaration"). Capitalized terms used but not defined in this Declaration shall have the meanings ascribed to them in the First Day Declaration, the DIP Motion, or the Interim Order attached as Exhibit A thereto, as applicable.

(a) developing or validating forecasts, business plans, and related assessments of strategic position; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) assessing and recommending cost reduction strategies; and (d) designing and negotiating financial restructuring packages. A&M is known for its ability to work alongside company management and key constituents during chapter 11 restructurings to develop a feasible and executable chapter 11 plan.

5. I have been a financial advisor to distressed companies for nineteen years. I have been employed by A&M since 2006, where I primarily work with executive teams in a variety of senior advisory and interim C-suite roles to improve the performance and profitability of underperforming businesses. My expertise covers all facets of turnaround situations, including cash flow forecasting, business plan review and development, creditor negotiations, debt restructurings, preparing and operating companies through the chapter 11 process, asset dispositions, liquidations, and wind-downs. Prior to joining A&M, I was a management consultant for three years. I have a dual bachelor's degree in economics and statistics from Rutgers University.

6. The Debtors engaged A&M on May 2, 2025, to serve as their financial advisor in connection with any potential restructuring transaction, sale transaction, or capital raising transaction, including the Debtors and their non-Debtor operations. I understand that the Debtors chose A&M for these roles because of our expertise on issues relating to financially distressed companies and our extensive experience acting as an advisor in both in-court and out-of-court restructurings of companies of all sizes across a wide array of industries. A&M and its professionals have considerable experience advising debtors in chapter 11 cases and have been employed as an estate compensated professional in various capacities in numerous chapter 11 cases in this and other districts. From the outset of A&M's retention, I have worked closely with the

Debtors' management team and other advisors to evaluate the Debtors' liquidity and cash needs.

### The Debtors' Need for DIP Financing

7. Based on A&M's review and analysis of financial data, as well as discussions with the Debtors' management and other advisors, I believe that the Debtors require additional liquidity in order to operate their business as a going concern in these chapter 11 cases and pursue Court approval of the Sale Transaction. I believe that this funding need is acute and that the Debtors require immediate access to postpetition financing to restart inventory shipments and guarantee appropriate inventory levels for the relevant Go-Forward Stores. As part of the sale negotiation and analysis process, the Debtors and their advisors analyzed how much postpetition financing would be required to operate the Debtors' business as a going concern and consummate the proposed sale to the Purchaser. Based on this analysis and related discussions, I believe that the Debtors' existing available cash is insufficient to finance the considerable amount of inventory purchases required to support the Debtors' operations as a going concern throughout the sale process and satisfy the conditions precedent to the close of the Sale Transaction. It is my belief that the Debtors require $22.5 million in incremental liquidity in order to preserve the viability of the Sale Transaction while they seek Court approval of the Sale Transaction. I believe that access to the proposed DIP Facility will provide the Debtors with the additional liquidity needed to restock inventory and ensure continued vendor shipments during these chapter 11 cases, thereby allowing the Debtors to execute the Sale Transaction with the Purchaser.

8. I believe that the Debtors' ability to continue funding ongoing operations during these chapter 11 cases is essential to maximize the value of the Debtors' assets and to consummate the Sale Transaction. Moreover, I believe that without access to the DIP Facility, the Debtors will most likely be unable to operate as a going concern through the conclusion of the sale process,

thereby jeopardizing a value-maximizing transaction. In my opinion, such a result would cause immediate and irreparable harm to the Debtors, their stakeholders, and the value of the Debtor's estates.

### The Debtors' Efforts to Secure DIP Financing

9. The Debtors and their advisors worked diligently to evaluate options for debtor-in-possession financing. More specifically, A&M worked with the Debtors' management and the other advisors, including their proposed legal advisor, Kirkland & Ellis LLP, to estimate the Debtors' postpetition financing needs in connection with operating as a going concern and to evaluate different paths available to obtain postpetition financing. Following this analysis, the Debtors and A&M determined that incremental liquidity is required to operate the Debtors' business as a going concern while pursuing court approval of the Sale Transaction. Additionally, because this liquidity need only arose in connection with their negotiation of the Sale Transaction, the Debtors were not on notice as to the timing, need, or quantum with respect to DIP sizing needs until very recently.

10. Accordingly, the Debtors engaged in good faith, arm's-length negotiations with the Prepetition Secured Parties to provide a source of incremental liquidity to fund their operations as a going concern through the close of the sale process. Despite the best efforts of the Debtors and their advisors, the Debtors' existing lenders were unwilling to provide the Debtors with debtor-in-possession financing.

11. After round-the-clock negotiations with the Purchaser, the Purchaser agreed to fund the DIP Facility in connection with the Sale Transaction. I believe the proposed DIP Facility will allow the Debtors to operate as a going concern while the Debtors pursue court approval of the Sale Transaction. Furthermore, it is my understanding that the Purchaser was the sole party to

offer postpetition financing to the Debtors, and that the Purchaser is willing to do so on a junior basis to the Prepetition ABL Lenders in the context of a going-concern sale transaction. As such, I believe that the DIP Facility represents the only viable path for the Debtors to obtain critical funding.

### The DIP Facility Is in the Best Interest of the Estates

12. As described above, the proposed DIP Facility and related documents were the result of good-faith, robust arm's-length negotiations between the Debtors, the Prepetition Secured Parties, and the Purchaser. I have reviewed the relevant terms of the proposed DIP Facility offered by the Purchaser. I believe that the funding provided by the DIP Facility will be sufficient to enable the Debtors to maintain going-concern operations at the Go-Forward Stores and bridge to the close of the Sale Transaction. Furthermore, it is my understanding that the DIP Facility provides the only executable financing available to the Debtors at this critical juncture of these chapter 11 cases. I believe that the proceeds of the DIP Facility are necessary for the Debtors to fund their operations and consummate a value-maximizing transaction through the contemplated sale process.

13. As stated previously, absent access to the DIP Facility, I do not believe that the Debtors would be able to operate as a going concern or to execute the Sale Transaction with the Purchaser on the terms and conditions set forth in the Asset Purchase Agreement. In my opinion, without the DIP financing, the Debtors would continue forward with a full chain liquidation. I believe that access to the DIP Facility will provide the Debtors with sufficient funds to operate the Go-Forward Stores as a going concern and consummate a value-maximizing transaction with the Purchaser. As such, I believe that the DIP Facility is in the best interest of the Debtors' estates and represents a sound exercise of the Debtors' reasonable business judgment.

**Conclusion**

14. I believe that, given the facts and circumstances in these chapter 11 cases, (i) the DIP Facility is the only financing available to the Debtors, (ii) that the proceeds of the DIP Facility will enable the Debtors to fund inventory purchases necessary to satisfy the conditions of the Sale Transaction, and (iii) that approval of the proposed DIP Facility is necessary to avoid immediate and irreparable harm to the Debtors' estates and is in the best interests of the Debtors, their creditors, and all other stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

| | |
|---|---|
| Dated: August 19, 2025<br>New York, New York | _/s/ Amy Lee_<br>Name: Amy Lee<br>Title: Managing Director<br>       Alvarez & Marsal North America, LLC |